766 A.2d 98

**Michael L. RAWLINGS,**

v.

**Deborah M. RAWLINGS.**

**No. 26, Sept. Term, 2000.**

Court of Appeals of Maryland.

Feb. 5, 2001.

Mark Gitomer (The Law Office of Mark Gitomer, on brief), Baltimore, for petitioner.

Kenneth P. Montgomery (Akman & Associates, P.C., on brief), Luthervlle, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

On 19 March 1999, the Circuit Court for Howard County found Michael L. Rawlings, Petitioner, in constructive civil contempt, pursuant to Maryland Rule 15–207(e),[1] of an 8 April 1996 Pendente Lite Order to pay child support. The unpaid child support totaled $33,679.00. On 29 March 1999, the

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Maryland Rule 15–207(e), effective on 1 January 1997, states:

(e) **Constructive civil contempt—Support enforcement action.**

(1) Applicability. This section applies to proceedings for constructive civil contempt based on an alleged failure to pay spousal or child support, including an award of emergency family maintenance under Code, Family Law Article, Title 4, Subtitle 5.

(2) Petitioner's burden of proof. Subject to subsection (3) of this section, the court may make a finding of contempt if the petitioner proves by clear and convincing evidence that the alleged contemnor has not paid the amount owed, accounting from the effective date of the support order through the date of the contempt hearing.

(3) When a finding of contempt may not be made. The court may not make a finding of contempt if the alleged contemnor proves by a preponderance of the evidence that (A) from the date of the support order through the date of the contempt hearing the alleged contemnor (i) never had the ability to pay more than the amount actually paid and (ii) made reasonable efforts to become or remain employed or otherwise lawfully obtain the funds necessary to make payment, or (B) enforcement by contempt is barred by limitations as to each unpaid spousal or child support payment for which the alleged contemnor does not make the proof set forth in subsection (3)(A) of this section.

(4) Order. Upon a finding of constructive civil contempt for failure to pay spousal or child support, the court shall issue a written order that specifies (A) the amount of the arrearage for which enforcement by contempt is not barred by limitations, (B) any sanction imposed for the contempt, and (C) how the contempt may be purged. If the contemnor does not have the present ability to purge the contempt, the order may include directions that the contemnor make specified payments on the arrearage at future times and perform specified acts to enable the contemnor to comply with the direction to make payments.

Md. Rule 15–207(e) (2000).

Circuit Court directed Petitioner serve six months in the Howard County Detention Center, with work release, and set a purge amount of $3,367.90. The Court of Special Appeals, in an unreported decision, affirmed the judgment of the Circuit Court. We granted Petitioner's petition for writ of certiorari, *Rawlings v. Rawlings,* 359 Md. 28, 753 A.2d 1 (2000), to consider the following questions:

1. Did the Circuit Court and the Court of Special Appeals err in finding that Maryland Rule 15–207 should not be applied retroactively [2] in this case?

2. Did the Circuit Court and the Court of Special Appeals err in finding Petitioner in contempt for failure to pay child support?

3. Did the Circuit Court and the Court of Special Appeals err in setting a purge provision in the amount of $3,367.90 and ordering the Petitioner incarcerated where the uncontroverted evidence showed that the Petitioner did not have the present ability to pay that amount?

I.

Michael L. Rawlings and Deborah M. Rawlings were married on 1 November 1980. Two children were born to the parties during their marriage: Sabrina Lynn Rawlings, born 14 April 1983, and Robert Michael Rising Rawlings, born 28 May 1985. On or about 16 February 1995, the parties separated.

On 22 August 1995, Respondent filed a Complaint to Establish Custody and For Other Relief in the Circuit Court for Howard County asking, in part, for custody of the parties' two children and for child support. The subject Pendente Lite

---

**2.** "Retroactive," as used by Petitioner, and "retrospective," as used in this opinion, are deemed synonymous for purposes of the present case. Both words "describe acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act." NORMAN J. SINGER, 2 STATUTES AND STATUTORY CONSTRUCTION § 41.01, at 337 (5th ed.1993); *see Langston v. Riffe,* 359 Md. 396, 406, 754 A.2d 389, 394 (2000).

Order was docketed on 9 April 1996. The Order provided, in part, that Respondent be granted pendente lite custody of the two children, that Petitioner have reasonable visitation of the children, and that Petitioner pay monthly child support of $854.00, accounting from 22 August 1995, plus an additional $100.00 per month against a child support arrearage of $4,524.00 as of 22 March 1996.

On 21 November 1996, after testimony was taken in front of a Special Master,[3] the Circuit Court granted Respondent a final divorce from Petitioner and ordered that the provisions of the April 1996 Pendente Lite Order be incorporated in the judgment and remain in full force and effect.[4]

Respondent filed a Complaint for Contempt on 27 October 1997 based on Petitioner's alleged failure to pay the ordered child support. On 19 March 1999, the Circuit Court held a civil contempt hearing, the content of which is discussed *infra* parts III & IV, and found Petitioner in civil contempt of the terms of the 8 April 1996 Pendente Lite Order and as those terms were incorporated in the 21 November 1996 final divorce order. On 29 March 1999, the court sentenced Petitioner to serve six months in the Howard County Detention Center on work release. The court set a purge amount of $3,367.90 and an appeal bond of $33,679.00.

Before the Court of Special Appeals, Petitioner raised the following two issues pertinent to our consideration of the case before us: (1) whether the Circuit Court erred in finding Petitioner in contempt for failure to pay child support; and (2) whether the Circuit Court erred in setting a purge provision in the amount of $3,367.90 and ordering Petitioner incarcerated when the evidence failed to show that Petitioner had the

3. Petitioner did not appear for the master's hearing.

4. Petitioner's subsequent efforts to modify his child support obligation were unsuccessful. Although the Circuit Court's disposition of his modification motion was an issue presented to and decided by the Court of Special Appeals in this litigation, Petitioner abandoned any challenge in this regard before us.

present ability to pay that amount. The Court of Special Appeals, in an unreported decision, affirmed.

The intermediate appellate court resolved that the Circuit Court did not err in finding Petitioner in contempt for failure to pay child support. The court stated that Maryland Rule 15–207(e), *supra* note 1, which became effective 1 January 1997 and authorizes a court to make a finding of constructive civil contempt in a support enforcement action even if the alleged contemnor may not have the present ability to comply with the support order, should not be applied retrospectively. In this regard, the court apparently accepted Petitioner's characterization that, because "some of his child support payments were due prior to January 1, 1997," application of Rule 15–207(e) to the evidence adduced at the 19 March 1999 contempt hearing regarding his total unpaid child support, most of which accrued after 1 January 1997, constituted an impermissible retrospective application of the Rule. Nonetheless, the court then appeared to apply the standards set forth in Rule 15–207(e) to Petitioner's case.[5] As to this issue, the intermediate court concluded that, on the evidence, "it was proper for the court to find that . . . [Petitioner] had the *past ability* to pay the child support and was therefore in contempt for failing to do so." (Emphasis added).[6] Lastly, the Court of

---

5. The Court of Special Appeals did not state expressly that it was applying Rule 15–207(e). The court, however, paraphrased the content of the Rule in its explanation of the law it applied to the facts of the present case and, as noted above, relied on the Circuit Court's conclusion that Petitioner had the *past* ability to pay the child support. The intermediate appellate court also stated:

> At the time of the contempt hearing, . . . [Petitioner] did not dispute the fact that he owed $33,679.00 in child support payments. The burden of proof then shifted to . . . [Petitioner] to prove that he could not be found in contempt because *(i) he never had the ability to pay more than the amount actually paid and (ii) he made reasonable efforts to become or remain employed or otherwise lawfully obtain the funds necessary to make payment.* (Emphasis added).

6. Neither the Court of Special Appeals nor the Circuit Court stated expressly that in finding Petitioner in contempt, that the Circuit Court applied the standards of Rule 15–207(e), to its contempt analysis, rather than the standard of *Lynch v. Lynch,* 342 Md. 509, 677 A.2d 584 (1996)

Special Appeals determined that the Circuit Court did not err in setting a purge provision in the amount of $3,367.90 and ordering Petitioner incarcerated because he "failed to show that he lacked the *then-present ability* to pay the purge figure ... and, therefore, the court was within its discretion to sentence him to six months in jail on work release." (Emphasis added).

We determine that the Circuit Court and the Court of Special Appeals did not err in their application of Rule 15–207(e) to the facts of the present case. We further conclude that the Circuit Court did not err in finding Petitioner in contempt for failure to pay child support as there was sufficient evidence to reach that conclusion. We resolve, however, that the Circuit Court erred in establishing the purge amount at $3,367.90 and ordering Petitioner incarcerated on the rec-

---

(determining that there is civil contempt only if there is the *present* ability to comply with the support order). The Circuit Court's reliance on Rule 15–207(e), however, seems apparent from both the Court of Special Appeals's application of the standards articulated in Rule 15–207(e) in its affirmance of the Circuit Court's judgment and the language, which mirrors that of Rule 15–207(e)(3), used by the Circuit Court in explaining its reasoning. The Circuit Court stated at its 19 March 1999 hearing:

So there is in these cases, as in most cases, a fact-finding responsibility on the Court that includes assessing the weight and the credibility of the witnesses. And, uh, Mr. Rawlings's credibility is at least zero perhaps minus. So that you have a tendency to believe the opposite of what he says. The most weighty sentence in the testimony that's taken an hour is, "I'm getting a job at five dollars an hour so I don't have to pay." That was the statement made. He didn't deny it. And he-that's precisely the consequences of what he's done. That's not what he's in fact done, but that's the consequences of what he's done. His total payments of nothing in 1996, and ninety dollars in 1997, are an accurate reflection of his attitude. We have an attitudinal problem here. We don't have a problem of occupation. We have an attitudinal problem. And we don't have means of addressing that. The Court is satisfied beyond a reasonable doubt, that the defendant has not paid in accordance with the order and that he has not—that *the Court finds by far in excess of preponderance of the evidence that he has not paid in accordance with his means. He's been doing siding work for other people. He's been working consistently and regularly as a bartender and that he has spent most of his time working on the improvements to this woman's house. Now if he chose to do them for nothing, that's his problem.* (Emphasis added).

ord before it. On remand, evidence may be adduced as to Petitioner's present ability to pay an appropriate amount as a purge provision or, pursuant to Rule 15–207(e), if Petitioner lacks the present ability to purge, the court may fashion directions as to how otherwise he is to make payment in the future or perform acts to enable him to make such payments. *See supra* note 1; *infra* pp. 104–105.

## II.

We first consider whether and how Rule 15–207(e) may apply to the present case, and if so, whether Rule 15–207(e) applies to the entire amount owed or only to that child support accruing and unpaid after 1 January 1997, the effective date of the Rule. Rule 15–207(e), *supra* note 1, authorizes the court to make a finding of constructive civil contempt even though the alleged contemnor may not have the present ability to pay the ordered child support.[7] First, the moving party must demonstrate by clear and convincing evidence "that a prior court order directed the party to pay the support or alimony and the alleged contemnor failed to make the court-ordered payments." *Jones v. State,* 351 Md. 264, 273, 718 A.2d 222, 227 (1998) (summarizing Rule 15–207(e)). The contemnor may then defend by establishing, by a preponderance of the evidence, "that the failure to pay was not an act of willful or contumacious non-compliance." *Id.* If the court makes a finding of contempt, then the court "must issue a written contempt order that specifies, in clear language, the amount of arrearage due, the sanction for the contempt, and what the contemnor must do to purge him or herself of the contempt." *Id.*

Rule 15–207(e) modifies the standard for determining contempt in child support cases explained in *Lynch v. Lynch,* 342 Md. 509, 677 A.2d 584 (1996). In *Lynch,* we explained that if

---

7. The validity of the new Rule is not challenged here. We shall review the relevant events leading to adoption of the Rule and how it changed the prior case law only to determine whether and how to apply the Rule to the present case.

a child support obligor could show that he or she did not have the present ability to pay the amount owed, then he or she could not be held in civil contempt. *Lynch,* 342 Md. at 521–22, 677 A.2d at 590. We stated:

Where the order is one prescribing or prohibiting a specified cause of conduct, the required defense showing is that the defendant is unable to conform his or her conduct in compliance with the court order. Where the order calls for the payment of money, the defendant is entitled to the "opportunity to show that he [or she] had neither the estate nor the ability to pay his [or her] obligation." [*Johnson v. Johnson,* 241 Md. 416, 420, 216 A.2d 914, 917 (1966) ]. In that situation, "[m]oreover, the *issue is not the ability to pay at the time the payments were originally ordered; instead, the issue is his present ability to pay."* *Elzey* [*v. Elzey* ], 291 Md. [369,] 374, 435 A.2d [445,] 448 [ (1981) ]. *Only if he or she fails to show such inability is a finding of contempt and subsequent imprisonment permitted. Id. See McDaniel v. McDaniel,* 256 Md. 684, 692–93, 262 A.2d 52, 57 (1970); *Schwartzman v. Schwartzman,* 204 Md. 125, 135, 102 A.2d 810, 815 (1954); *Oles Envelope Corp. v. Oles,* 193 Md. 79, 92, 65 A.2d 899, 905 (1949); *Dickey v. Dickey,* 154 Md. 675, 681, 141 A. 387, 390 (1928).

*Id.* (emphasis added) (second, third, and fifth alterations in original).

█ The committee note accompanying Rule 15–207 explains that section (e) regarding constructive civil contempt and support enforcement actions was enacted to modify this holding in *Lynch.* According to the committee note, section (e) modifies the holding in *Lynch*

by allowing a court to make a finding of constructive civil contempt in a support enforcement action *even if* the alleged contemnor does not have the present ability to *purge.* In support enforcement cases, as in other civil contempt cases, after making a finding of contempt, the court may specify imprisonment as the sanction if the contemnor has the present ability to purge the contempt.

If the contemnor does not have the present ability to purge the contempt, an example of a direction to perform specified acts that a court may include in an order under subsection (e)(4) is a provision that an unemployed, able-bodied contemnor look for work and periodically provide evidence of the efforts made. If the contemnor fails, without just cause, to comply with any provision of the order, a criminal contempt proceeding may be brought based on a violation of that provision. (Emphasis added).

We have noted previously that Rule 15–207(e) modified *Lynch* in the sense that "a finding of contempt under 15–207(e) requires only a determination that the alleged contemnor had the ability in the past to comply with the court order." *Jones*, 351 Md. at 276, 718 A.2d at 228. Rule 15–207(e), however, does not change the requirement in *Lynch* that

any party judged to be a civil contemnor must be afforded the opportunity to show a *present inability to purge* the contempt: "Where the order calls for the payment of money, the defendant is entitled to the 'opportunity to show that he [or she] had neither the estate nor the ability to pay his [or her] obligation.' " *Lynch*, 342 Md. at 521, 677 A.2d at 590 (alterations in original) (quoting *Johnson*, 241 Md. at 420, 216 A.2d at 917)

*Jones*, 351 Md. at 276, 718 A.2d at 228 (emphasis added).

In *Lynch*, as noted *supra* p. 103, a person could not be found in civil contempt for not paying a certain amount of money, such as that required by a court order, if the person did not have the present ability to pay.[8] Under this standard, both determining contempt and the contemnor's ability to

---

8. In *Lynch*, we rejected the Court of Special Appeals's and petitioner's arguments that "the present financial inability to comply applies only to the sanction, *i.e.*, the purge provision and not the finding of contempt." *Lynch*, 342 Md. at 528, 677 A.2d at 594. We noted that [i]n their view, it is enough if the evidence reveals that the defendant could have complied with the order at some time during its life and/or that the defendant's financial inability to comply is caused by the defendant's bad faith decision and intentional act, orchestrated to frustrate or avoid compliance with the court order. *Id.*

comply with the purge provision were evaluated based on the person's financial capabilities at the same point in time, the present, i.e., the contempt hearing. *Lynch,* 342 Md. at 521, 677 A.2d at 590 (citing *Elzey,* 291 Md. at 374, 435 A.2d at 448). In *Lynch,* we reasoned:

> Moreover, because the purpose of civil contempt proceedings is to coerce future compliance, [*State v. Roll & Scholl,* 267 Md. 714, 728, 298 A.2d 867, 876 (1973) ], the defendant must have been fully capable of having complied; in addition, the ability to perform the act required by the court order must have been within the power of the defendant. *Elzey,* 291 Md. at 374, 435 A.2d at 446 (quoting *Williams & Fullwood [Fulwood] v. Director,* 276 Md. 272, 313, 347 A.2d 179, 201 (1975)), *cert. denied,* 425 U.S. 976, 96 S.Ct. 2178, 48 L.Ed.2d 801 (1976).

*Lynch,* 342 Md. at 520–21, 677 A.2d at 590. Present inability to comply with the court order was a defense against being held in contempt. *Lynch,* 342 Md. at 521, 677 A.2d at 590.[9]

In *Lynch,* we explained why the standard for determining contempt and the ability to purge was whether there was a *present* ability (1) to pay in accordance with the support order and then (2) to purge the contempt order. *Lynch,* 342 Md. at 528, 677 A.2d at 594. If the contemnor does not have the present ability to pay or to comply with the support order, then he or she may not be able to pay the purge amount, and before one can be imprisoned after a finding of civil contempt,

---

**9.** The adoption of Rule 15–207(e) changed this. The Rule provided that contempt cannot be found "if the alleged contemnor proves by a preponderance of the evidence that (A) from the date of the support order through the date of the contempt hearing the alleged contemnor (i) *never* had the ability to pay more than the amount actually paid and (ii) made reasonable efforts to become or remain employed or otherwise lawfully obtain the funs necessary to make payment." Rule 15–207(e)(3) (emphasis added). Thus, as to the contempt determination, according to Rule 15–207(e), the trial court is to look at the entire period between when the relevant support order was entered and the contempt hearing is conducted. Although a person may be held in contempt whether he or she has the present ability to purge under the Rule, the present ability to meet a purge amount remains a pivotal factor in determining the consequences after civil contempt is found.

one must "have an opportunity to purge the contempt." *Lynch,* 342 Md. at 519–20, 677 A.2d at 590. Moreover, if the civil contemnor is sentenced to imprisonment after being unable to prove a present inability to purge, then he or she must have the "keys to the prison in his or her pocket"— imprisonment coupled with a purge amount.[10] *Id.* (citing *In re Nevitt,* 117 F. 448 (8th Cir.1902)); *see Johnson,* 241 Md. at 419, 216 A.2d at 916 (noting that "[w]hether or not the father was subject to incarceration depends on whether he was able to meet the obligation imposed on him by the support order"); *see also Rutherford v. Rutherford,* 296 Md. 347, 355, 464 A.2d 228, 232–33 (1983); *Roll & Scholl,* 267 Md. at 728, 298 A.2d at 876; *Elzey,* 291 Md. at 374–75, 435 A.2d at 447.[11]

In addition, we stated that the goal of civil contempt proceedings is "to coerce compliance with a court order ... [, and] [i]f the responsible party does not have money, or any means of obtaining it, payment cannot be coerced." *Lynch,* 342 Md. at 523, 677 A.2d at 591. Thus, it was thought at the time that if one was held in contempt based on a past ability to

---

**10.** It is important to note that in *Jones v. State,* 351 Md. 264, 718 A.2d 222 (1998), we determined that a sentence of two years in jail, "suspended on condition that the contemnor obey a court order forthwith" is a criminal sanction and is thus an illegal sanction for a civil contemnor. We reasoned:

The contempt order imposed an illegal sanction for civil contempt because (1) the sentence is a determinate two-year sentence which does not include a purge clause, and (2) the order did not provide Appellant with the opportunity, before incarceration, to show his inability to comply with the court-ordered payments.

*Jones,* 351 Md. at 278, 718 A.2d at 229.

**11.** In *Lynch,* we noted that "[p]roof of inability to comply, however, does not guarantee immunity from imprisonment." Rather, in certain situations in which the inability to comply was caused by a deliberate effort or a willful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court, the civil contempt proceeding should be terminated and new proceedings may be instituted which can result in a finding of criminal contempt.

*Lynch,* 342 Md. at 522, 677 A.2d at 590–91 (internal quotation marks omitted) (quoting *State v. Roll & Scholl,* 267 Md. 714, 730, 298 A.2d 867, 877 (1973)).

pay, but it was shown that the he or she did not have the present ability to purge, then holding that person in contempt was a form of punishment, which is not permitted in civil contempt proceedings. We explained in *Lynch:*

[M]erely finding a defendant in contempt of court does not ordinarily further the purpose of coercing future compliance with the court order. Indeed, a finding of contempt, where there is no possibility of enforcing compliance with the court order to which it relates, simply labels the defendant a contemnor and imputes guilt to him or her.... As our cases recognize, civil contempt requires a purge provision with which the defendant is able to comply in order to purge, *i.e.,* clear or exonerate, him or herself of the contempt.

*Lynch,* 342 Md. at 529, 677 A.2d at 594 (citations omitted). We further concluded that "[w]here, based on past acts and/or the defendant's lack of good faith compliance with the court order, a finding of contempt is permitted to stand, the defendant is denied any opportunity to purge the contempt." *Id.*

The "legislative history" of Rule 15–207(e) discussed the impact of the *Lynch* holding. In a letter from the then Chair of this Court's Standing Committee on Rules of Practice and Procedure regarding proposed Rule 15–207(e), it was explained:

there is widespread concern that the *Lynch* decision has made the enforcement of child and spousal support orders very difficult. The Committee was advised that, in some areas of the State, enforcement through civil contempt proceedings has effectively been eliminated.

The support enforcement personnel were aware, long before *Lynch,* that it was impermissible for a court, in a civil contempt action to imprison the obligor for nonpayment of court-ordered support if the contemnor was not then able to comply with the purge provision. The practice, however, in such a case, was for the court to make a finding of contempt based on evidence that the obligor had had the ability to make payments during the period at issue, set a purge amount, and direct the obligor either to make specific

payments on the arrearage in the future or to take other specific steps, such as searching for employment, to enable him or her to make those payments.[12] The witnesses indicated that, in most instances, that approach was successful in producing payments.

The problem now, according to the witnesses, is that *Lynch* prohibits a finding of contempt unless the obligee can prove an ability to purge on the day of the hearing, and it is extremely difficult, if not impossible, to have such immediately up-to-date information. The obligee may have evidence of employment or other ability to pay at the time the petition is filed but may be unable to prove that ability on the day of the hearing, which may be weeks later. Absent that ability, no finding of contempt can be made, and absent a finding of contempt, no purge provision can be set. The whole coercive mechanism fails.

The Committee was persuaded that the witnesses' interpretation of *Lynch* was correct and that the rule should be changed to permit a finding of contempt based on evidence of an ability to pay during the period preceding the hearing. This change would not, of course, allow the court to imprison an obligor in the absence of evidence that he or she is capable of meeting the purge provision; its function is simply to allow the finding of contempt, coupled with a purge and, when appropriate, directions that the obligor make specific payments in the future or take other specific actions to enable him or her to make those payments. This is reflected in the proposed changes to Rule 15–207.[13]

---

**12.** *But see Eldridge, J., Dissent from Adoption of Rule 15–207,* Filed Dec. 10, 1996 (on file with Standing Committee on Rules of Practice and Procedure) [hereinafter *Eldridge Dissent* ] (contending that *Lynch* did not change existing law in this manner and stating that ''[i]t has consistently been recognized in Maryland, long before the *Lynch* decision, that present inability to comply is an affirmative defense in a civil contempt proceeding, precluding an adjudication of contempt'').

**13.** Letter from Hon. Alan M. Wilner, Chairman, Standing Committee on Rules of Practice and Procedure, to Hon. Robert M. Bell, C.J., Hon. John C. Eldridge, Hon. Lawrence F. Rodowsky, Hon. Howard S.

■ Rule 15–207(e) resolved *Lynch*'s concern regarding the inability to purge if contempt is based on the past ability to pay or if the contemnor is determined to be unable presently to satisfy the purge amount.[14] Rule 15–207(e)(4) requires that if it is determined that the contemnor does not have the present ability to *purge*, then "the [contempt] order may include directions that the contemnor make specified payments on the arrearage at future times and perform specified acts to enable the contemnor to comply with the direction to make payments." Rule 15–207(e)(4). As the committee note explains, and as noted *supra*, "[i]f the contemnor fails, without just cause, to comply with any provision of the order, [then] a criminal contempt proceeding may be brought based on a violation of that provision." Rule 15–207(e) thus complies with the notions in *Lynch* that one must first have the opportunity to demonstrate an inability to pay his obligation and, if imprisonment is ordered, the ability to purge, thus retaining the remedial nature of civil contempt proceedings [15]—civil

Chasanow, Hon. Robert L. Karwacki, Hon. Irma S. Raker (Oct. 31, 1996) (on file with Standing Committee on Rules of Practice and Procedure).

**14.** *But see Eldridge Dissent* (stating that Rule 15–207(e) suggests that "the proponents of the new rule intend for an adjudication of contempt to be somewhat punitive without the necessity of resorting to criminal contempt proceedings" and arguing that "the new Rule is apparently intended to authorize a punitive adjudication or verdict because of past misconduct, perhaps with the hope that this punitive adjudication and the threat of imprisonment will somehow entice the defendant . . . to obtain money for support obligations, but without providing the defendant with the procedural safeguards heretofore guaranteed in punitive contempt proceedings").

**15.** In *Jones*, we explained that there are three general categories of sanctions for contempt:

Determinate sanctions, which are criminal sanctions, such as a jail sentence of one year; (2) coercive sanctions, which are civil sanctions, such as imprisonment until the contemnor complies with an order of the court or a fine to be applied until the contemnor complies; and (3) remedial sanctions, such as a civil fine payable to the plaintiff to compensate the plaintiff for losses suffered as a result of the contemnor's non-compliance.

contempt is to force compliance and not to punish.[16] More-over, the goal of civil contempt of forcing compliance is met when the contemnor is provided with directions as to how to comply and only upon failure to do so may a criminal contempt proceeding be brought. Thus, Rule 15–207(e) provides an extra opportunity for a contemnor to comply with the order before being subject to *criminal* contempt proceedings.[17]

*Jones*, 351 Md. at 278, 718 A.2d at 229 (footnote omitted) (citation omitted). We further noted that only "coercive and remedial sanctions may be imposed in civil contempt proceedings." *Jones*, 351 Md. at 279, 718 A.2d at 230. A coercive sanction in civil contempt proceeding is when the contemnor has been found to have the ability to purge and is thus incarcerated and provided with a purge amount—the key out of prison. An example of a remedial sanction in civil contempt is Rule 15–207(e)(4)–type order.

**16.** We explained in *Lynch*:

A "provision for purging" or the "opportunity for purging" relates to affording the defendant "the chance to rid him or herself of guilt and thus clear himself of the charge." *Herd v. State*, 37 Md.App. 362, 377 A.2d 574, 576 (1977). According to Black's Law Dictionary 1236 (6th Ed.1990), to "purge" is "[t]o cleanse; to clear. To clear or exonerate from some charge or imputation of guilt, or from a con-tempt." Criminal contempt proceedings offer a decided contrast. The object of those proceedings is to punish the contemnor for past misconduct which, unlike in the case of civil contempt, may not necessarily be capable of remedying. The penalty imposed in such cases need not provide a purging provision; it may be purely puni-tive. *Roll & Scholl*, 267 Md. at 728, 298 A.2d at 876.

*Lynch*, 342 Md. at 520, 677 A.2d at 589–90; *see Jones v. State*, 351 Md. at 277, 718 A.2d at 229.

**17.** Again, in such situations a contemnor cannot be subject to imprison-ment as a result of civil contempt, in part, because "[i]f a defendant is unable [to] pay a purge provision, no amount of time in prison will induce compliance." Imprisonment with no ability to purge can only result then as a result of criminal contempt proceedings. One of the reasons for not permitting contempt when there was a present inability to purge was that the proper step was a criminal proceeding. We stated:

[T]o the extent that this record reflects that the respondent failed to pay the court-ordered support when able and quit her job in bad faith, for the purpose of avoiding the responsibility and, in the process frustrated the court order, the petitioner could have, and should have, initiated criminal contempt proceedings, for the purpose of punishing the respondent for those acts.

*Lynch*, 342 Md. at 529, 677 A.2d at 594; *see also Elzey*, 291 Md. at 376, 435 A.2d at 449, *Johnson*, 241 Md. at 419, 216 A.2d at 916.

Nonetheless, a defendant's present inability to pay, other than as a pre-requisite consideration to setting the purge amount, was abolished effectively as a defense to a contempt finding by the adoption of Rule 15–207(e).

We determine that the *Lynch* standard does not apply to the consideration of whether Petitioner was in constructive civil contempt as to any portion of the arrearages found in the present case; rather, Rule 15–207(e) is the applicable standard. We further resolve that the Court of Special Appeals was incorrect in expressly concluding that the application of Rule 15–207(e) to this case was impermissibly retrospective. Even though Petitioner's question is framed in terms of whether the Circuit Court and the Court of Special Appeals erred in *not applying* 15–207(e) retrospectively, Petitioner argues that both courts erred in *applying* 15–207(e) retrospectively after determining that it should not be so applied. Petitioner, however, is wrong in arguing that the courts, despite some ambiguities in their explained reasoning, inconsistently applied 15–207(e) retrospectively.

Though it is not as clear that the Circuit Court did so, *see supra* notes 5-6, it is apparent that the Court of Special Appeals initially stated broadly that Rule 15–207(e) should not be applied retrospectively and, in a subsequent breath, seemed to apply the Rule "prospectively" on the assumption that it was the date of the filing of the contempt complaint, 27 October 1997, and not the docketing of the initial support order, 9 April 1996, that was the dispositive vantage point from which to consider retrospectivity versus prospectivity. All of the alleged unpaid support properly was considered, even that portion accrued prior to 1 January 1997, because Rule 15–207(e)(2) states that the petitioner for constructive civil contempt must prove "that the alleged contemnor has not paid the amount owed, *accounting from the effective date of the support order through the date of the contempt hearing.*" (Emphasis added).

In this respect, the Court of Special Appeals and the Circuit Court applied the Rule correctly, though under a

misperception that to do so was not a retrospective application. It is logical to view the initiation of the constructive civil contempt proceedings pertaining to failure to pay spousal or child support as controlling because a support order, such as the Pendente Lite Order in this case, standing alone does not lead necessarily to the initiation of a contempt proceeding. An alleged support order violation is prerequisite to a contempt proceeding; the order itself does not amount to the initiation of the contempt proceeding for purposes of the Rule at issue. This appears clear from the language of the Rule. The petitioner's burden of proof under Rule 15–207(e) requires him or her to prove "by clear and convincing evidence that the alleged contemnor has not paid the amount owed *accounting from the effective date of the support order through the date of the contempt hearing.*" Rule 15–207(e) (emphasis added). This language demonstrates that the violation of the support order is part of that which must be proven.

The Court of Special Appeals stated, in its unreported opinion in this matter, the following regarding the Rule's retrospectivity:

> Rule 15–207 does not contain any statement instructing or implying that it should be applied retroactively. Moreover, the Legislature [and the Court of Appeals] knows how to express its own intent when it desires retroactive application. *Owens Corning v. Bauman,* 125 Md.App. 454, 531, 726 A.2d 745, *cert. denied, Owens Corning v. Hammond,* 354 Md. 572, 731 A.2d 970 (1999).

Though these observations are not inaccurate in and of themselves, when the retrospectivity analysis is taken to its fruition, it is clear that Rule 15–207(e) is a remedial rule with expressly intended retrospective sweep.

█ To ascertain the permissible retrospective or prospective [18] sweep of Rule 15–207(e), it is necessary to examine and

---

**18.** A prospective statute or rule is one which "operates on conduct, events, and circumstances which occur after its enactment." 2 SINGER, *supra* note 2, § 41.01, at 337.

"effectuate the legislative intention." [19] *Mason v. State,* 309 Md. 215, 219, 522 A.2d 1344, 1345 (1987) (citing *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986); *Reid v. State,* 302 Md. 811, 816, 490 A.2d 1289 (1985); *Atlantic Richfield Co. v. Sybert,* 295 Md. 347, 456 A.2d 20 (1983)); *see Langston v. Riffe,* 359 Md. 396, 410, 754 A.2d 389, 392–96 (2000). Generally, "[r]etrospective operation is not favored by the courts ... and a law will not be construed as retroactive unless the act clearly, by express language or necessary implication, indicates that the legislature intended a retroactive application." NORMAN J. SINGER, 2 STATUTES AND STATUTORY CONSTRUCTION § 41.04, at 349 (5th ed.1993). We stated in *Mason v. State:*

[S]everal well settled rules of statutory interpretation are applicable in seeking to ascertain the actual intention of the legislature. These are: (1) A statute is presumed to operate prospectively from its effective date, absent clear language to the contrary, or unless the manifest intention of the Legislature indicates otherwise; (2) Despite the presumption of prospectivity, a statute effecting a change in procedure only, and not in substantive rights, ordinarily applies to all actions whether *accrued, pending or future,* unless a contrary intention is expressed; and (3) A statute affecting or impairing substantive rights will not operate retrospectively as to transactions, matters, and events not in litigation at the time the statute takes effect unless its language clearly so indicates.

*Mason,* 309 Md. at 219–20, 522 A.2d at 1346 (emphasis added) (footnotes omitted).

Neither the Rule nor its accompanying note states expressly whether the Rule should be applied retrospectively or only prospectively. *See Langston,* 359 Md. at 406, 754 A.2d at 394 ("There is a general presumption in the law that an enactment

---

19. With regards to construing rules of court, "we apply principles of interpretation similar to those used to construe a statute." *Holmes v. State,* 350 Md. 412, 422, 712 A.2d 554, 558 (1998) (internal quotation marks omitted) (quoting *State v. Harrell,* 348 Md. 69, 79–80, 702 A.2d 723, 728 (1997)).

is intended to have purely prospective effect. In the absence of clear legislative intent to the contrary, a statute is not given retrospective effect.")(quoting *Spielman v. State*, 298 Md. 602, 607, 471 A.2d 730, 733 (1984) (internal quotation marks omitted)). We also have stated, as the Court of Special Appeals took note of *supra*, that the Rule or its accompanying comment could have stated, had it been the Court's intention, how Rule 15–207(e) could be applied retrospectively. *See Washington Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co. Inc.*, 308 Md. 556, 568, 520 A.2d 1319, 1325 (1987) (stating that "when the General Assembly intends a statute to have retrospective application, it knows how to express that intent" and providing examples thereof); *Owens Corning v. Bauman*, 125 Md.App. 454, 531, 726 A.2d 745, 783 (1999), *cert. denied, Owens Corning v. Hammond*, 354 Md. 572, 731 A.2d 970 (1999). It is also true that the Rule has a clearly stated effective date of 1 January 1997. One scholar explained:

> The power to enact laws includes the power to fix a future effective date. *A statute with a definite effective date commences operation from that time.* The rule applies only where a contrary intent is not manifest in the act itself. Where a contrary intent is expressly stated a statute should take effect in accordance with the purpose and intent of the body which enacts it.

2 SINGER, *supra*, § 33.07, at 17 (emphasis added).

The second inquiry, which the Court of Special Appeals did not reach, as explained *supra* in *Mason*, is whether, even though there is a presumption of prospectivity, the Rule only effects procedure, and not substantive rights, and is therefore remedial in nature and may be applied retrospectively unless a contrary intention is expressed. After analysis of this factor, it is clear that Rule 15–207(e) contemplates, on its face, a degree of potential retrospective application. In *Langston v. Riffe*, we explained that remedial statutes

> *are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries.* They also include statutes intended

for the correction of defects, mistakes and omissions in the civil institutions and the administration of the state. The definition of a remedial statute has also been stated as a statute that relates to practice, procedure, or remedies and does not affect substantive or vested rights.

Every statute that makes any changes in the existing body of law, excluding only those enactments which merely restate or codify prior law, can be said to "remedy" some flaw in the prior law or some social evil.

*Langston*, 359 Md. at 409, 754 A.2d at 395 (quoting 3 SINGER, *supra*, § 60.02, at 152 (footnotes omitted)).

We then discussed the difficulty in defining substantive or vested rights, noting:

A most natural definition of the term "vested" is "accrued" or, as dictionaries put it, "completed and consummated." But in that sense, any claim or interest which has come into being and been perfected as a "right" would have to be said to be vested. . . .

Justice Holmes once remarked with reference to the problem of retroactivity that "perhaps the reasoning of the cases has not always been as sound as the instinct which directed the decisions," and suggested that the criteria which really governed are "the prevailing views of justice." The problem is to comprehend what real considerations influence judgment in application of "the prevailing views of injustice."

. . . .

It is impossible to discover the precise meaning of the term through which all of the decisions can be consistently explained. Most of the numerous attempts at definition are essentially circuitous in nature, as in the pronouncement that "a vested right, as that term is used in relation to constitutional guarantees, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not be deprived arbitrarily without injustice." Thus "vested right means simply a right which under particular circumstances will be protected from legislative interference. Another definition notes that a vested right is

an immediate right of present enjoyment or a present fixed right of future enjoyment."

*Langston,* 359 Md. at 419–20, 754 A.2d at 401(alterations in original) (internal quotation marks omitted) (quoting 2 SINGER, *supra,* §§ 41.05, 41.06, at 369–70, 379).

We concluded that the statute under scrutiny in *Langston,* Maryland Code (1984, 1999 Repl.Vol.), section 5 1038(a)(2)(i)(2) of the Family Law Article, which allows "a circuit court to set aside or modify a paternity declaration 'if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order,'" applies retrospectively as it was remedial and did not affect any substantive rights. *Langston,* 359 Md. at 400, 754 A.2d at 391 (quoting § 5–1038(a)(2)(i)(2) of the Family Law Article). Thus, § 5–1038(a)(2)(i)(2) of the Family Law Article applies to paternity declarations issued prior to the law's effective date of 1 October 1995. *Langston,* 359 Md. at 403, 754 A.2d at 392. In reaching this conclusion we determined from the language of the statute (which stated that it covers proceedings) and from the extensive legislative history (which indicated clearly that the Legislature intended the statute to be remedial) that the statute is remedial in nature. *Langston,* 359 Md. at 408–17, 754 A.2d at 395–400. We then explained that the statute did not interfere, destroy, or modify any substantive or vested rights. *Langston,* 359 Md. at 420–21, 754 A.2d at 402.

In determining that the statute in *Langston* was remedial, we noted that "[m]any statutory issues relating to family law are considered remedial." *Langston,* 359 Md. at 409, 754 A.2d at 399 (internal quotation marks omitted) (quoting 3 SINGER, *supra,* § 60.01, at 147). It is clear that the same may be said of Rule 15–207(e), which also "applies to *proceedings* for constructive civil contempt," as did the statute in *Langston.* Additionally, it has long been understood that civil contempt is remedial. Civil contempt proceedings are defined as being "coercive or remedial in nature." BLACK'S LAW DICTIONARY 313 (7th ed.1999). Moreover, the U.S. Supreme Court has recognized the remedial nature of civil contempt proceedings. The

Court explained that "[i]f it is for civil contempt the punishment is remedial, and for the benefit of the complainant." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). We have also noted that civil contempt proceedings are remedial in nature. In *Lynch,* we stated that "[a] civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties. These proceedings are generally *remedial in nature* and are intended to coerce future compliance." *Lynch,* 342 Md. at 519, 677 A.2d at 589 (alteration in original) (internal quotation marks omitted) (quoting *Roll & Scholl,* 267 Md. at 728, 298 A.2d at 876).

Additionally, as noted *supra,* remedial statutes are those which "can be said to remedy some flaw in the prior law." *Langston,* 359 Md. at 409, 754 A.2d at 399. Rule 15–207(e) is curative in that it alters the *Lynch* standard. The committee note to the Rule explains that "[s]ection (e) *modifies* the holding in *Lynch v. Lynch,* 342 Md. 509, [677 A.2d 584] (1996)." (Emphasis added). *See also supra* pp. 14–15 (discussing the history of Rule 15–207(e)). Therefore, it seems clear that Rule 15–207(e) is remedial in nature, and as such, "[t]he general rule is that statutes dealing with a remedy are to be applied to actions tried after their passage even though the right or cause of action arose prior thereto." 3 SINGER, *supra,* § 60.01, at 147.

Even though the Rule is remedial, we must consider also whether its retrospective application would modify or destroy a substantive or vested right. We stated in *Langston* that "[g]enerally, a remedial or procedural statute may not be applied retroactively if it will interfere with vested or substantive rights." [20] *Langston,* 359 Md. at 418, 754 A.2d at 400. Stated otherwise, "[i]n the final part of a retroactivity analysis,

---

**20.** One scholar explained:

If a statute is remedial, there is a presumption that it applies to cases pending at the time of its enactment. But remedial statutes are not accorded retrospective application where it would disturb vested

a court must determine whether the retroactive application of the statute or ordinance would interfere with vested rights." *Waters Landing Ltd. Partnership v. Montgomery County,* 337 Md. 15, 29, 650 A.2d 712, 718 (1994).

Retrospective application of Rule 15–207(e) would not impair the substantive rights of an alleged contemnor, here Petitioner.[21] In *Langston,* we touched upon the possible substantive rights involved with child support, and we reiterate the same here to demonstrate that substantive rights are not affected by Rule 15–207(e). We explained that there exists in the child or petitioning parent a vested right in monetary support already paid and to the arrears owed in support.[22] *Langston,* 359 Md. at 422–23, 754 A.2d at 400.

---

rights. However, a remedial statute may be given retrospective effect without unconstitutionally infringing on vested rights if the new statutory remedy redresses a preexisting actionable wrong.

3 SINGER, *supra* note 2, § 60.02, at 153 (footnotes omitted).

21. As noted *supra* in notes 12 and 14, Judge Eldridge argued that Rule 15–207(e) improperly eliminated an affirmative defense in that under *Lynch,* Petitioner could have defended against being held in contempt because, on the day of the hearing, he lacked the present ability to pay the arrearages. *See Lynch,* 342 Md. at 523, 677 A.2d at 591. One jurisdiction has determined that not providing a contemnor with the opportunity to demonstrate inability to comply financially as a defense to a contempt order, as provided by existing Ohio law, is a denial of due process. *Greene v. Greene,* 1996 WL 263634, at *8, 1996 Ohio App. LEXIS 1984, at *20–21 (Ohio Ct.App. May 20, 1996). We, along with other jurisdictions, however, have determined that the elimination of an affirmative defense does not hinder, eliminate, or modify a substantive right, and thus, a statute or rule that eliminates an affirmative defense can be applied retrospectively. *See, e.g., Waddell v. Kirkpatrick,* 331 Md. 52, 59, 626 A.2d 353, 356 (1993) (stating that a "statute of limitations affects only the remedy, not the cause of action"); *Peterson v. Minneapolis,* 285 Minn. 282, 173 N.W.2d 353, 356 (1969) (determining that there is no vested right to the defense of contributory negligence); *see also* 2 SINGER, *supra* note 2, § 41.06, at 381 ("Legislation abolishing the defense of contributory negligence and adopting the principle of comparative negligence has been held susceptible to retroactive application, denying that there is a vested right to the defense of contributory negligence.").

22. As noted in *Langston,* 359 Md. at 423, 754 A.2d at 403, "[a] vested right has been equated with 'property' ... to qualify it for protection from arbitrary interference." 2 SINGER, *supra* note 2, at § 41.06, at 380.

Neither of those rights are modified or destroyed in the present case. Rather, Rule 15–207(e) provides a remedy to secure such rights, and "[t]here is no vested right in a particular remedy or procedure so long as an adequate remedy exists." 2 SINGER, *supra,* at § 41.06, at 380 (footnotes omitted). It has further been explained:

> [N]o person has a vested right in a particular remedy for enforcement of a right, or in particular modes of procedure, or rule of evidence. The legislature may pass retroactive acts changing, eliminating, or adding remedies, so long as efficacious remedies exist after passage of the act.

*Id.* at § 41.16, at 429. We have also stated that "[s]tatutes which do not destroy a substantial right, but simply affect procedure or remedies, are not considered as destroying or impairing vested rights, for there is no vested right in any particular mode of procedure for the enforcement or defense of the right." *Winston v. Winston,* 290 Md. 641, 650, 431 A.2d 1330 (1981) (quoting *Kelch v. Keehn,* 183 Md. 140, 144, 36 A.2d 544, 545 (1944)).

### III.

The Circuit Court did not err in finding, and the Court of Special Appeals did not err in affirming, that Petitioner was in civil contempt for failure to pay child support. Respondent met her burden of proof, by clear and convincing evidence, that Petitioner had not paid the amount owed, accruing according to the 8 April 1996 Pendente Lite Order and through the date of the contempt hearing, 19 March 1999. *See* Rule 15–207(e)(2). According to the Pendente Lite Order, Petitioner was ordered to pay child support in the amount of $854.00 per month plus $100.00 per month on arrears that had accumulated in the amount of $4,524.00 as of 22 March 1996. The certified record from the Support Enforcement Unit was admitted at the 19 March 1999 civil contempt hearing as Respondent's Exhibit 1, without objection from Petitioner. That exhibit showed that at the time of the contempt hearing Petitioner owed $33,679.00 in child support. Petitioner paid no child support in 1996, $90.00 in 1997, $995.00 in 1998, and,

as of 19 March 1999, had paid $75.00 for 1999. From these undisputed facts, the Circuit Court correctly found that Petitioner had "not paid in accordance with the order," and the Court of Special Appeals correctly concluded that Respondent had met her burden and that Petitioner "did not dispute the fact that he owed $33, 679.00 in child support."

Once Respondent met her burden, Petitioner, so as not to be held in contempt, was required to show by a preponderance of the evidence that "from the date of the support order through the date of the contempt hearing he (i) never had the ability to pay more than the amount actually paid and (ii) made reasonable efforts to become or remain employed or otherwise lawfully obtain the funds necessary to make payment." Rule 15–207(e)(3). Petitioner testified that, prior to the parties' separation, he earned sixty to one hundred thousand dollars per year,[23] but that after the separation, he had not earned more than six thousand dollars per year.

At the contempt hearing, Petitioner and Respondent testified that Petitioner owned and operated a landscaping and excavation business while they were married and that this business required the use of heavy equipment. Respondent also testified that she retained possession, after the parties separated, of some of the heavy equipment needed to do the excavation work and that, on advice of counsel, she had refused to release to Petitioner at least one of the pieces of equipment in her control [24] until Petitioner signed a separation

---

**23.** Respondent testified that while they were married, Petitioner made between one hundred thousand and two hundred thousand dollars a year in gross income.

**24.** Prior to the parties' separation, they owned a 450 Case loader, which according to Respondent "disappeared," and a Case backhoe that subsequently was repossessed for nonpayment. The other pieces of heavy equipment that they owned were a D8 bulldozer, a 955 track loader, a 931 track loader (which Respondent characterized as a smaller, rather than a heavy, piece of equipment), and a Case skid loader. Respondent testified that she had in her possession the 955 loader, the D8, and the Case skid loader. She further testified that on advice of her counsel, she refused to permit Petitioner to use the 931 until he agreed to pay the child support and that the 955 was at a repair

agreement "guaranteeing" payment of child support. She further testified, however, that, against advice of counsel, she released one of the other machines to Petitioner and had him sign a note promising to return the equipment in two weeks. Petitioner acknowledged that he took this piece of equipment, but, after about a month, Respondent retrieved the piece of equipment from its job location without first notifying him. According to Respondent, however, Petitioner never returned the piece of equipment, and furthermore, Petitioner "had every piece of equipment that he need[ed] to operate with." In riposte, Petitioner testified that he was unable to do his landscaping and excavating without the equipment that Respondent had in her possession. Moreover, Petitioner related that he could not rent equipment as he did not have any credit and his license to drive [25] had been suspended in the State of Maryland for non-payment of child support.

On these disputed facts, Petitioner argues that the Circuit Court's finding of contempt was erroneous. He posits "that due [his] to ex-wife's steadfast refusal to allow him access to his equipment, . . . [he] was prohibited from pursuing his livelihood of fifteen years"—landscaping and excavation. The Circuit Court, however, found Petitioner's testimony to be less than credible. The trial judge stated that Petitioner's "credibility is at least zero, perhaps minus. So that you have a tendency to believe the opposite of what he says." The court's finding that Petitioner lacked credibility is supported on this record.[26] Although Petitioner consistently

shop and payments needed to be made on it before it could be removed from the shop.

25. The record does not indicate what type of license Petitioner had that had been suspended.

26. The credibility of a witness is a matter for the trier of fact to determine. *See, e.g., Hill v. State,* 231 Md. 458, 462, 190 A.2d 795, 797 (1963), *cert. denied,* 375 U.S. 861, 84 S.Ct. 127, 11 L.Ed.2d 88 (1963); *Bird v. State,* 231 Md. 432, 436, 190 A.2d 804, 806 (1963); *see also* Md. Rule 8–131(c) (2000) (stating that "[w]hen an action has been tried without a jury, the appellate court . . . will give due regard to the opportunity of the trial court to judge the credibility of the witnesses").

attributed his alleged lack of income to not having the excavation and landscaping machinery, he also testified that most of it would have been useless on the Eastern Shore of Maryland where he had moved in 1996.[27] Petitioner further testified that his "big money maker" among the pieces of machinery was a Bobcat, a small tractor that could be used in the prevailing soil conditions on the part of the Eastern Shore where he lived, but that he did not use his own Bobcat when working for others, using his employer's equipment instead. Moreover, Petitioner testified that, at the time of the contempt hearing, he had a Bobcat parked in the front yard of the residence where he resided on the Eastern Shore.

Additionally, even though Petitioner testified that since his separation from Respondent he had earned a maximum of only six thousand dollars per year,[28] on cross-examination he admitted working full-time at a number of jobs for earnings that were not reported. He completely restored a bar/restaurant. He restored a house and built an addition doubling the size of the home. He did roofing work on another house. He worked two nights per week as a bouncer in a bar. Petitioner testified that he had tried to find other employment, but could not; however, he could only identify one job for which he had applied.

Considering all of the testimony, the Circuit Court determined:

> We have an attitudinal problem. And we do have means of addressing that. The Court is satisfied beyond, beyond a

---

Our analysis of the court's credibility determination necessarily concedes demeanor-driven factors and considers only the content of the testimony.

27. Petitioner explained: "And when I moved south, it's swampy ground, so the heavy equipment down there does not do me any kind of income. I mean, I can use the lighter weight one, but I can't locate it. She [Respondent] has possession of it. It's disappeared and she says she doesn't have it."

28. Petitioner testified: "I probably don't make six thousand, if even that, a year. I mean, it's just—there's no income."

reasonable doubt, that the defendant has not paid in accordance with the order and that he has not—the Court finds by *far in excess of a preponderance of the evidence* that he has not paid in accordance with his means. He's been doing siding work for other people. He's been working consistently and regularly as a bartender and that he has spent most of his time working on the improvements to this women's house. Now if he chose to do them for nothing, that's his problem. That's not our problem. That's his problem. If he has that talent and has the ability to spend that much time, he has an obligation to support his children. This is what we call a, uh, a father without intentions of fulfilling his legal obligations. Therefore, the Court finds that the defendant is in contempt of the order.... (Emphasis added).

The Court of Special Appeals concluded that "it was proper for the [Circuit] [C]ourt to find that ... [Petitioner] had the *past* ability to pay the child support and was therefore in contempt for failing to do so. We affirm the lower court on this issue." (Emphasis added). We agree.

## IV.

We agree, however, with Petitioner that the Circuit Court, on this record, erred in setting a purge provision in the amount of $3,367.90, and ordering Petitioner incarcerated, when no evidence was presented to show that Petitioner had the present ability to pay that amount. Furthermore, we agree with Petitioner that the Court of Special Appeals erred in affirming the Circuit Court in this regard. Rule 15–207(e)(4) requires that once a finding of constructive civil contempt has been made, as in the present case, the court issues a written order that specifies "(A) the amount of the arrearage for which enforcement by contempt is not barred by limitations, (B) any sanction imposed for the contempt, and (C) how the contempt may be purged." Rule 15–207(e)(4). If the contemnor, however, does not have the *present ability* to purge the contempt, "the order may include directions that the contemnor make specified payments on the arrearage at future times and perform specified acts to enable the contemnor

to comply with the direction to make payments." *Id.* The committee note to Rule 15–207(e) further states that "after making a finding of contempt, the court may specify imprisonment as the sanction *if* the contemnor has the *present ability to purge the contempt.*" (Emphasis added). Thus, if the contemnor does not have the present ability to purge, imprisonment is not an immediately available sanction. Rather, if a contemnor does not have the present ability to purge, then an order as prescribed in subsection (e)(4) is an available form of relief. The Rule does not eliminate, however, the option of terminating the civil proceeding and initiating a criminal contempt proceeding for a defendant who is contumacious in refusing to pay.[29] The committee note states that an example of such an (e)(4) order may include "that an unemployed, able-bodied contemnor look for work and periodically provide evidence of the efforts made. If the contemnor fails, without just cause, to comply with any provision of the order, a *criminal contempt proceeding* may be brought based on a violation of that provision." (Emphasis added).

In *Jones v. State,* 351 Md. 264, 718 A.2d 222 (1998), we explained that Rule 15–207(e) does not change the holding of

---

**29.** We explained this option in more detail in *State v. Roll & Scholl,* 267 Md. 714, 298 A.2d 867:

Situations may arise where at a hearing held pursuant to an order to show cause in what properly began as a civil contempt, facts are presented which indicate that the alleged contemnor cannot comply with the order of the court that directed him to perform an act for the benefit and advantage of another party to the suit. If this inability to comply was caused by a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court, the civil contempt proceeding should be terminated and new proceedings may be instituted which can result in a finding of criminal contempt. *Cf. Tyler v. Baltimore County,* 256 Md. 64, 71, 259 A.2d 307 (1969). *Roll & Scholl,* 267 Md. at 730, 298 A.2d at 877; *see Elzey,* 291 Md. at 375–76, 435 A.2d at 448–49. The difference is with Rule 15–207(e), no longer is terminating the civil proceedings and initiating a criminal proceedings the only available relief or the necessary relief when the contemnor establishes an inability to comply as it was in *Roll & Scholl* and *Elzey.* *See also supra* note 11. *But see Eldridge Dissent* (contending that Rule 15–207(e) is "directly inconsistent" with this holding in *Roll & Scholl*).

*Lynch* with regard to when one can be incarcerated after being adjudicated in civil contempt. *Jones,* 351 Md. at 276, 718 A.2d at 228. We stated that

> [u]nder Rule 15–207, the finding of civil contempt does not pose an immediate threat of incarceration to the contemnor. Maryland law has long required a distinct regimen of substantive and procedural safeguards for persons found to be in civil contempt of a support enforcement order. "Only if [the contemnor] fails to show [a *present* ] inability [to pay] is ... subsequent imprisonment permitted."

*Jones,* 351 Md. at 275–76, 718 A.2d at 228 (alterations in original) (emphasis added) (internal quotations omitted) (quoting *Lynch,* 342 Md. at 521–22, 677 A.2d at 590).

 We elaborated:

> The procedural component to this restrictive requirement is that any party judged to be a civil contemnor must be afforded the opportunity to show a present inability to purge the contempt: "Where the order calls for the payment of money, the defendant is entitled to the 'opportunity to show that he [or she] had neither the estate nor the ability to pay his [or her] obligation.' "

*Jones,* 351 Md. at 276, 718 A.2d at 228 (alterations in original) (internal quotations omitted) (quoting *Lynch,* 342 Md. at 521, 677 A.2d at 590 (quoting *Johnson v. Johnson,* 241 Md. 416, 420, 216 A.2d 914, 917 (1966))). Only a civil contemnor with the present ability to purge, and who chooses not to pay, may be incarcerated. A contemnor must be "given an opportunity to show that he ha[s] neither the estate nor the ability to pay his obligation and fail[s] to make such a showing." *Id.* (alterations in original) (internal quotations omitted) (quoting *Johnson,* 241 Md. at 420, 216 A.2d at 917). The reasoning behind only permitting incarceration of a contemnor with the present ability to purge is that "before the contemnor may be imprisoned, he or she must have an opportunity to purge the contempt, that is to say, he or she must have the keys to the prison in his or her pocket." *Lynch,* 342 Md. at 519, 677 A.2d at 589 (citing *In re Nevitt,* 117 F. at 459); *see Johnson,* 241

Md. at 419–20, 216 A.2d at 916–17. Thus, if a civil contemnor does not have the present ability to purge, he or she is not subject to incarceration in the constructive civil contempt proceeding.

■ With regard to setting the purge amount in the present case, the following occurred at the 29 March 1999 hearing:

> THE COURT:. . . . All right, the sentence is six months in the Howard County Detention Center. That'll be on work release. Child support will be withheld from your income. Purge figure is thirty-three thousand six hundred and seventy-nine dollars. If you win the Maryland Lottery, you can pay that off.
>
> . . .
>
> [PETITIONER'S ATTORNEY]: Your honor, may I be heard just as to the purge provision.
>
> THE COURT: Yeah.
>
> [PETITIONER'S ATTORNEY]: My understanding of the case law is that in setting the purge provision that the Court has to take into account the, the defendant's present ability to, to purge himself of, of the contempt. And I don't think that there has been any evidence submitted—
>
> THE COURT: What figure would you be suggesting . . . ?
>
> [PETITIONER'S ATTORNEY]: Frankly, I think a figure in the amount of, say, twenty-five hundred dollars—I mean, that's more than he has. But as far as a purge provision, I think it's really more tied to not what the, the ultimate amount that is owed it, but what kind of present ability a defendant has to meet it. I mean, as far as present ability, his present ability is probably zero. But, but obviously if the Court's not gonna set a zero purge provision, but I think that as far as thirty-three thousand dollars purge provision, I think—
>
> THE COURT: Well, that's just what was owed. I—I don't have any means of determining a figure.
>
> [PETITIONER'S ATTORNEY]: Well—

THE COURT: I mean, here's a person without a job, without a driver's license, going to jail. Now what would you suggest?

[PETITIONER'S ATTORNEY]: Well, that's why I'm using a figure of, of—

THE COURT: Twenty-five.

[PETITIONER'S ATTORNEY]:—of twenty-five hundred. I just, again, I think that to, to use the thirty-two thousand is . . .

THE COURT: Well, . . . [RESPONDENT'S ATTORNEY], you're familiar with the case law. What does it say?

[RESPONDENT'S ATTORNEY]: Well, Your Honor, I think . . . [PETITIONER'S ATTORNEY] is correct in that the defendant has to have—

THE COURT: All right, what's the figure?

[RESPONDENT'S ATTORNEY]: I'd say no less than five thousand dollars, Your Honor.

THE COURT: Five thousand. And you get five thousand from where?

[RESPONDENT'S ATTORNEY]: Well—

THE COURT: What is your source for five?

[RESPONDENT'S ATTORNEY]: Clearly he can work. I think there's no question that he has the ability to work.

THE COURT: Let me ask you this. If he's in jail on work release and they're going to subtract child support from his income, is it mathematically possible for him to earn five thousand dollars in ninety days?

[RESPONDENT'S ATTORNEY]: In six months, Your Honor?

THE COURT: Six months. I'm sorry.

[RESPONDENT'S ATTORNEY]: Yeah, I think he could do that.

THE COURT: Okay. All right.

[PETITIONER'S ATTORNEY]: Not unless he's going out to practice law, but other than that I don't—there's no way—going to Burger King, whatever they're gonna do.

And I don't think he has a law degree, Your Honor. But again, for the Court to say this is the amount that's owed and this is what I'm gonna set as the purge provision, that—that doesn't square with my understanding of what the case law says.

THE COURT: All right. Ten percent. Is that acceptable?

[PETITIONER'S ATTORNEY]: That's acceptable, Your Honor.

No evidence was adduced that Petitioner had the present ability to pay $3,367.90 to purge, unless one credits his attorney's responses as an admission of fact. In the absence of evidence bearing on present ability to pay any purge sum, however, it appears that speculative negotiations took place between the court and the parties' attorneys on this point. Petitioner's attorney initially stated that Petitioner did not have the present ability to pay a purge figure set at any amount. He subsequently suggested, however, $2500 (based on no facts that the record reveals) and ultimately did agree to the amount of ten percent of the total arrearages, $3,367.90. It appears to us that Petitioner's attorney offered-up the $2500 and agreed to the $3,367.9, not necessarily because Petitioner could actually and presently pay this amount, but because the court initially placed him in a quandary. The judge firstly announced his intent to set the purge amount at $33,679.00, the full amount of the arrearages. As Petitioner's attorney noted *supra*, it appeared that the court had no intention of considering an e(4)-type order. Under these circumstances, we construe Petitioner's attorney's remonstrations with the judge and opposing counsel as an attempt to negotiate the purge amount as low as he believed the court would go, notwithstanding the absence of any supporting evidence that Petitioner had the present ability to pay $2500, $3,367.90, or any other amount. Under these circumstances, counsel was not admitting that Petitioner had the present ability to pay $2500 or $3,367.90.[30]

---

**30.** We note that it is well settled under Maryland law that

As Petitioner notes in his brief, "[t]he court's most telling comment was when it remarked, 'Well, that's just what was owed. I—I don't have any means of determining a figure.' And that [i]s precisely the problem. Not only did the court [and counsel, we might add] engage[d] in speculation as to what the purge figure should be, it also failed to make a finding that the Petitioner had the present ability to meet this amount." Petitioner's Br. at 25. What the Circuit Court engaged in is what we warned against in *Thrower v. State ex rel. Bureau of Support Enforcement*, 358 Md. 146, 747 A.2d 634 (2000). In *Thrower*, we stated:

[I]t may be frustrating to judges and masters to deal with people who appear to be deliberately ignoring their child-support obligations, by spending available funds for other purposes, by voluntary impoverishment, by refusing to obtain steady employment, or by other techniques—people who return time and again with excuses that the judge or master finds incredible or inadequate and who thus seem to flaunt their defiance of properly entered court orders. Nonetheless, because a person's liberty is at stake and

---

there is a *prima facie* presumption that an attorney has authority to bind his client by his actions relating to the conduct of litigation. *Posko v. Climatic Control Corp.*, 198 Md. 578, 584 [, 84 A.2d 906 (1951) ]; *Wanzer v. State*, 202 Md. 601, 608, [,97 A.2d 914 (1953) ]; *Thomas v. Hopkins*, 209 Md. 321, 327 [, 121 A.2d 192 (1956) ]; *Smith v. Warden*, 213 Md. 643 [, 131 A.2d 392 (1957) ].... This is particularly true of stipulations or admissions made in the course of trial.

*Secor v. Brown*, 221 Md. 119, 123, 156 A.2d 225, 227 (1959); *see Kinkaid v. Cessna*, 49 Md.App. 18, 22–23, 430 A.2d 88, 90–91 (1981).

It could be argued that Petitioner's attorney made a binding admission that Petitioner had the present ability to pay $3,367.90 when the attorney accepted that purge amount. We are disinclined to view it as such because Petitioner's attorney earlier made the contradictory statement that Petitioner did not have the present ability to purge at any amount. The record does not reflect that Petitioner's counsel consulted with his client before agreeing to the purge amount. As Petitioner's present ability to pay is a matter of fact, doubt is cast on what Petitioner's attorney may have been conceding. The law requires more before the court establishes a purge amount, the non-payment of which may lead to the incarceration of Petitioner in a civil contempt proceeding.

because it is a judicial proceeding, both the form and substance of due process and proper judicial procedure must be observed. Shortcuts that trample on these requisites and conclusions that are based on hunch rather than on evidence are not allowed.

*Thrower*, 358 Md. at 161, 747 A.2d at 642. As in *Thrower*, "[t]here was not a scintilla of evidence to support a conclusion," *id.*, that Petitioner, based on the facts in the record, had the current ability to purge and as such should not have been subject to incarceration.

Moreover, the Court of Special Appeals erred in affirming the Circuit Court's purge amount. The intermediate appellate court determined:

Finally, ... [Petitioner] argues that the court erred in setting a purge provision in the amount of $3,367.90 and ordering him incarcerated when the evidence showed that he did not have the present ability to pay that amount.

Any person judged to be a civil contemnor must be afforded the opportunity to show a present inability to purge the contempt, that is, to show that he or she has neither the estate nor the ability to pay his or her obligation. Unless and until the contemnor has been given an opportunity to show that he has neither the estate nor present ability to pay his obligation and fails to make such a showing, he should not be incarcerated. [Petitioner] ... failed to show that he lacked the then-present ability to pay the purge figure of $3,367.90 and, therefore, the court was within its discretion to sentence him to six months in jail on work release. [Petitioner] argued that he could not earn the $3,367.90 because ... [Respondent] was in possession of his work equipment. Notwithstanding that testimony, *the court found that ... [Petitioner] had sufficient skills as an excavator and contractor to earn the money while on work release.* (Footnotes omitted) (citations omitted) (emphasis added).

In a footnote, the Court of Special Appeals explained that "[u]nder the work release program, an inmate who is sen-

tenced to the jurisdiction of the Division of Correction may be granted the privilege of leaving actual confinement during necessary and reasonable hours to work at gainful public or private employment or, under appropriate conditions, to seek employment." (Quoting MD.CODE ANN., CORR. SERV. § 3–801 (1999)). Neither the Circuit Court nor the Court of Special Appeals, however, demonstrated how, with work release, Respondent would be able to come up with the $3,367.90 to avoid incarceration in the first instance. We conclude that, under the circumstances present here, it was not demonstrated that Petitioner had either the estate or the present ability to pay the purge amount at its set amount. Although Petitioner may have had the present ability to pay the $3,367.90, there was no evidence indicating that he did. On remand, evidence may be adduced to establish either a proper purge amount or, if a present inability to pay a purge amount exists, a proper order pursuant to 15–207(e)(4), may be fashioned with "directions that ... [Petitioner] make specified payments on the arrearage at future times and perform specified acts to enable ... [Petitioner] to comply with the direction to make payments."

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REVERSE IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID TWO–THIRDS BY PETITIONER AND ONE–THIRD BY RESPONDENT.*

BELL, C.J., concurs in result only.